UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

BLUE SKY TOWERS III, LLC and ORANGE
COUNTY-POUGHKEEPSIE LIMITED
PARTNERSHIP d/b/a VERIZON WIRELESS

                             Plaintiffs,

    vs.

TOWN OF LAGRANGE, NEW YORK, THE
ZONING BOARD OF APPEALS OF THE TOWN OF
LAGRANGE, THE PLANNING BOARD OF THE
TOWN OF LAGRANGE, THE DEPARTMENT OF
PLANNING AND PUBLIC WORKS OF THE TOWN OF
LAGRANGE, and THE BUILDING, ZONING AND
FIRE PREVENTION DEPARTMENT THE TOWN OF
LAGRANGE,

                             Defendants.
_____

**COMPLAINT**

Docket No.:

Plaintiffs Blue Sky Towers III, LLC ("Blue Sky") and Orange County-Poughkeepsie Limited Partnership d/b/a Verizon Wireless ("Verizon Wireless") (collectively, "Plaintiffs"), by and through their attorneys, alleges as follows:

## I. INTRODUCTION

1.    The Nation's wireless infrastructure is a critical communications pathway that is extensively employed and heavily relied on by the public—including residents and businesses, the traveling public, emergency service providers, hospitals and health care professionals, law enforcement personnel, government officials, and the 911 North American emergency system. Congress and the Federal Communications Commission ("FCC") have emphasized the importance of a seamless nationwide wireless network, and the need to allow wireless carriers to fill gaps in their coverage without delay by municipal planning and zoning boards. This case involves just such a coverage gap in the Town of LaGrange, New York ("Town").

1

2.      Plaintiffs Verizon Wireless and Blue Sky have been forced to bring this Complaint because the Town has denied Plaintiffs' application for local zoning approvals to construct and operate a new wireless telecommunications facility in an area of the Town experiencing significant gaps in service.  The proposed facility includes a one hundred (100) foot monopole tower.  The tower would be substantially screened from view due to its location within a mature set of trees, the tallest of which measure approximately ninety (90) feet in height.

3.      The property upon which the facility is proposed is located in the Residential Flexible Density zoning district, which permits new wireless telecommunications facilities upon issuance of a Special Use Permit by the Planning Board of the Town.

4.      Due to the proximity of the project site to an airport, the Federal Aviation Administration ("FAA") determined that an aviation warning light was required on the top of the monopole.  Under the Town's zoning ordinance, the FAA lighting required a variance from the Town Zoning Board of Appeals. The FAA also determined that the tower needs to be painted orange and white.

5.      On November 4, 2019, the Town of LaGrange Zoning Board of Appeals ("ZBA") voted to deny the Plaintiffs' area variance application.

6.      The ZBA's denial is in blatant disregard of controlling New York precedent regarding the applicable standards to be applied to applications for wireless carriers seeking to develop a necessary telecommunications facility, as articulated in *Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364, 372 (1993).

7.      The ZBA's denial is not supported by the extensive record and equates to an unlawful prohibition of the provision of personal wireless services.   The proposed

telecommunications facility is the least intrusive, and only means for closing significant gaps in wireless coverage in the town.

8.     This action seeks an order annulling the decision of the Zoning Board of Appeals and ordering and directing the Defendants to issue all permits and approvals necessary to construct and operate the Facility (defined below).

## II.  JURISDICTION AND VENUE

9.     This Court has federal jurisdiction over this action under 28 U.S.C. §1331.  The case arises under the Federal Communications Act of 1934, as amended by the Telecommunications Act of 1996 (the "TCA"), including 47 U.S.C. §332(c)(7)(B). This Court also has jurisdiction over this action under 28 U.S.C. §1337(a), because the Federal Communications Act and the TCA are acts of Congress regulating commerce.

10.     Pursuant to 28 U.S.C. §1367, this Court has supplemental jurisdiction over the State law claims under Article 78 of the New York Civil Practice Law and Rules ("CPLR").

11.     This Court has jurisdiction to order declaratory and injunctive relief under 28 U.S.C. §§2201 and 2202 because there is an actual controversy between the parties.

12.     Venue is proper in this district under 28 U.S.C. §1391(b).  The Defendants are located in the Southern District of New York, a substantial part of the events or omissions giving rise to the claim occurred in this district, and the property that is the subject of this action is situated in this district.

## III.  EXPEDITED PROCEEDING

13.     Pursuant to 47 U.S.C. §332(c)(7)(B)(v) of the TCA, Blue Sky and Verizon Wireless respectfully request expedited treatment of this Complaint.

## IV.  PARTIES

14.     Plaintiff Blue Sky Towers III, LLC is a leading developer of wireless infrastructure throughout the country.

15.     Blue Sky is a Delaware limited liability company, with a principal place of business at 352 Park Street, Suite 106, North Reading, Massachusetts 01864.

16.     Plaintiff Orange County-Poughkeepsie Limited Partnership is a New York limited partnership doing business as Verizon Wireless.

17.     The principal place of business of Verizon Wireless is One Verizon Way, Basking Ridge, New Jersey 07920.

18.     Verizon Wireless is licensed by the FCC to provide wireless services throughout New York State, including commercial mobile services and personal wireless services (as those terms are defined under federal law) in and around LaGrange, New York.

19.     Defendant Town of LaGrange is, upon information and belief, a municipal corporation located in Dutchess County, New York.

20.     Defendant Zoning Board of Appeals of the Town of LaGrange ("ZBA") is an administrative board of the Town.

21.     The ZBA is responsible for, *inter alia*, issuing use and area variances in accordance with the Town Law of the State of New York and Article IX, §240-92, of the Code of the Town of LaGrange ("Code").

22.     Defendant Planning Board of the Town of LaGrange ("Planning Board") is an administrative board of the Town and is responsible for, *inter alia*, issuing special use permits and site plan approvals in accordance with the Town Law of the State of New York and Article VII, Section 240-71 of the Code.

4

23.     Defendant Department of Planning and Public Works of the Town of LaGrange, *inter alia*, is the Town's department that coordinates and manages the Planning Board and works closely with the LaGrange Building and Zoning Office to ensure compliance in all phases of project development. *See* http://www.lagrangeny.gov/Government/planningpublicworks.htm.

24.     Defendant Building, Zoning and Fire Prevention Department of the Town of LaGrange ("Building Department") is an administrative department of the Town, and is responsible for issuing building permits in accordance with Article VIII, Section 240-81 of the Code.

## V. BACKGROUND

### A. *The Wireless Industry*

25.     The wireless industry continues to experience substantial growth nationally, and within the State of New York. National data indicates that as of 2018, there were approximately 421.7 million subscriber connections active in the United States, an increase of more than 21 million connections over the prior year (2017).

26.     Subscriber usage on the Verizon Wireless network is more than doubling year-over-year, and this trend is expected to continue for the foreseeable future.

27.     Data from the Centers for Disease Control and Prevention indicates that as of June, 2018 (a) approximately fifty-five percent (55%) of all adults and children live in households that have replaced landline service with only wireless service, and (b) forty-two percent (42%) of American homes receive all or almost all calls on wireless devices despite also having landline service.  This trend, sometimes referred to as "cutting the cord," is increasing and, as a result, wireless networks must now handle communications from multiple wireless devices owned by

multiple members of a household (that previously were addressed by a single household connection to the landline system).

28.     The FCC reports that the number of 911 calls from mobile phones has significantly increased in recent years with an estimated eighty percent (80%) of all 911 calls now being made from mobile devices. That percentage is continuing to grow.

29.     From a public safety standpoint, advances in wireless technology are causing the federal government to rapidly move forward with plans to upgrade the 911 system to enable the acceptance of all manner of wireless communication, including text messages, photos and video. The FCC is also engaged in efforts to make modern wireless and broadband devices accessible for emergency and non-emergency use to persons with disabilities.  For these new services to function properly, additional network capacity and bandwidth are critical.

30.     In this context, wireless telecommunications of all forms are vital to the public welfare, safety and convenience and are not a mere luxury or entertainment item.  To ensure the continuity of emergency and non-emergency wireless telecommunications within the broader Verizon Wireless network, it is imperative that network coverage and capacity needs be addressed promptly, so that the Verizon Wireless network can continue to function without interruption during emergencies and catastrophic conditions.

31.     The United States government recognizes the critical nature of the wireless industry to the nation.  Cellular phone towers are recognized as "critical infrastructure."[1]

---

[1]   "Critical infrastructure are the assets, systems, and networks, whether physical or virtual, so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, national economic security, public health or safety." Federal Register Volume 74, No. 234, page 64585 (December 8, 2009).

### B. Regulatory Framework

32.     In recognition of the importance of wireless communications infrastructure, Congress enacted the TCA. With the passage of the TCA, Congress created a new telecommunications regime designed to promote competition and higher quality services for American telecommunications consumers and to encourage the rapid deployment of new telecommunications technologies.

33.     In furtherance of these goals, the TCA reduces the impediments posed by local regulations by placing certain restrictions on the regulatory powers of local governments with regard to the siting and placement of personal wireless service facilities.

### C. Relevant TCA Provisions

34.     Section 332(c)(7) of the TCA imposes a number of procedural and substantive limitations on local zoning decisions to ensure that local governments do not frustrate the TCA's goals of promoting competition, higher quality services and the rapid deployment of new telecommunications technologies.

35.     Section 332(c)(7)(B)(i) provides that:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof –
>
> (I)     shall not unreasonably discriminate among providers of functionally equivalent services; and
>
> (II)     shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

36.     Section 332(c)(7)(B)(ii) provides that:

> A State of local government or instrumentality thereof shall act on any request to place, construct, or modify personal wireless service facilities within a reasonable  period of time after the request is duly

filed with such government or instrumentality, taking into account the nature and scope of such request.

37.     Section 332(c)(7)(B)(iii) requires that:

Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

38.     Section 332(c)(7)(B)(iv) provides that:

No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

39.     Section 332(c)(7)(B)(v) provides that:

Any person adversely affected by any final decision or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction.  The court shall hear and decide such action on an expedited basis…

(Emphasis added)

40.     This action is ripe for determination under the TCA.

41.     This case was timely filed.  The ZBA denied the variance on November 4, 2019.

### D.  State and Local Government Zoning Requirements

42.     Because of the essential nature of its services, Verizon Wireless is considered a public utility for purposes of zoning under New York decisional law.

43.     As a public utility, Verizon Wireless is entitled to a have its variance application reviewed under the well-established public utility variance standard applicable to all public utilities.

44.     Under Chapter 240, Article IV, Section 240-49(D) of the Town Code, construction of new communications towers is permitted in the Residential Flexible Density ("RFD") zoning district upon issuance of a special use permit by the Planning Board.

45.     Under Chapter 240, Article IV, Section 240-49(G)(2)(b)[2] of the Town Code, the maximum height of communications towers is that which shall permit operations without artificial lighting.

46.     When Verizon Wireless first applied for a permit from the Planning Board, it was not known whether a variance was required.  During its extensive review, and while application was pending before the FAA, the Planning Board requested, and Verizon Wireless and Blue Sky agreed, to relocate the site of the proposed facility to a location on the Property with higher elevation and tall trees.  As a result, Blue Sky reapplied to the FAA for the new location.  The FAA determined that the proposed monopole at the new site required marking and artificial lighting due to the proximity to a regional airport.

### E.  FAA Determination

47.     The FAA's Determination of No Hazard to Air Navigation (Correction) (the "FAA Determination") was issued on or about August 6, 2019 and concludes that "…the structure would not be a hazard to air navigation provided the following condition(s) is (are) met: As a condition to this Determination, the structure is to be marked/lighted in accordance with FAA Advisory circular 70/7460-1 L Change 2, Obstruction Marking and Lighting; paint/red lights – Chapters 3 (Marked), 4, 5 (Red), & 12." A copy of the FAA Determination is attached hereto as **Exhibit A**.

48.     The need for marking and lighting of the tower is a result of the structure's proximity to the Hudson Valley Regional Airport ("HVRA"), formerly known as the Dutchess County Airport.

49.     The FAA Determination triggered Blue Sky and Verizon Wireless' application for a variance.

50.     Under Chapter 240, Article IX, Section 240-92, the ZBA is empowered to issue variances to enable a use or configuration which is not in accordance with or is prohibited by the Town's Code.  The Town Code, in effect, prohibits construction of a telecommunications tower that requires artificial lighting.   Accordingly, relief from the prohibitions in Section 240-49(G)(2)(b)[2] of the Town Code requires the issuance of a variance from the ZBA.

## VI.     HISTORY OF APPLICATION TO CONSTRUCT A WIRELESS COMMUNICATIONS FACILITY

51.     On December 8, 2016, Verizon Wireless submitted an application to the Planning Board for a special use permit and site plan approval (the "SUP Application") in connection with its original proposal to construct and operate a wireless telecommunications facility, including a 124-foot monopole telecommunications facility (128' when including a 4' lightning rod) and associated improvements and equipment on property located at 333 Maloney Road in LaGrange, Dutchess County, New York (the "Property").

52.     The purpose of the project was to address: (A) significant gaps in wireless coverage in a portion of the Town; and (B) capacity issues with Verizon Wireless' local network.

53.     Verizon Wireless's SUP Application included the requisite fees, forms and drawings, including (without limitation) (i) a Statement of Intent describing the project in detail, (ii) a Full Environmental Assessment Form ("EAF") under the State Environmental Quality Review Act ("SEQRA") prepared by Rettew Engineering & Surveying PC ("Rettew"), (iii) a redacted Option and Land Lease Agreement with the property owner, (iv) a Radio Frequency ("RF") Report prepared by George Karim, Verizon Wireless' RF Design Engineer, (v) a Site Selection Analysis prepared by Airosmith Development, Inc., and (vi) an RF Safety Report

prepared by Millennium Engineering, P.C. ("Millennium"), which confirms that the proposed facility will be in full compliance with FCC emission requirements.

54.     Subsequent to filing the SUP Application, Verizon Wireless and Blue Sky entered into an arrangement whereby Blue Sky agreed to build and own the tower structure in exchange for Verizon Wireless agreeing to lease space on the tower and within the Facility (defined below) compound.

55.     Throughout the extensive review of the SUP Application, Plaintiffs Blue Sky and/or Verizon Wireless supplemented the SUP Application with additional supporting materials, including an RF Addendum, Visual Resource Evaluations, updated site plans, lighting details of the FAA required lights, and the FAA consultant's letter concerning a potential alternative location at a property known as the Corbin Farm.

56.     After the January 19, 2017 initial presentation meeting, meetings and public hearings with the Planning Board concerning the project occurred on multiple dates in 2017, 2018, and 2019.

### A. The Original Facility/Site

57.     The unmanned public utility/personal wireless service facility, as originally proposed, was a 124-foot monopole tower made of galvanized steel with twelve (12) panel antennas on a three sided array (mounted on three (3) separate twelve (12) foot antenna mounts) on the top and a four-foot lightning rod that extended its height to 128 feet (the "Original Facility").

58.     In late October, 2018, the Planning Board suggested that the Applicant relocate the proposed facility from an open field to a location that would allow for a tower that was approximately 24 feet lower, and which would be surrounded by mature trees.

59.     In early 2019, Plaintiffs submitted supplemental application materials in support of the SUP Application.  The supplemental application materials were intended, *inter alia*, to address the Planning Board's aesthetic concerns. As a result of relocating the project to its new location, Plaintiffs were able to modify the design of the tower structure to minimize the potential visual impacts to the surrounding area to greatest extent feasible by:

      a.   relocating the facility from the original location in an open field on the Property to an area located within a stand of existing mature trees;

      b.   reducing the height of the tower from 124 feet to 100 feet;

      c.   reducing the number of antennas from twelve (12) to six (6); and

      d.   reducing the size of the antenna mounts from twelve (12) feet to six (6) feet.

(the "**Facility**").

60.     The relocated Facility is proposed within a 125+/- ft. x 125+/- ft. (15,625+/- sq. ft.) lease area with an easement for access and utilities.  The relocated lease area and easement are referred to as the "Site."  The Site is located on lands owned by Charles Ostuni at 333 Maloney Road in the Town.

61.     The Facility will be substantially and naturally screened from view because it will be surrounded by existing mature trees.

62.     The Facility includes an equipment platform approximately 11.5 ft. x 16 ft. in size and associated antennas, improvements and access/utilities.  The base station will be fully screened from neighboring properties and will be surrounded on all sides by a 60 ft x 60 ft fenced enclosure (within the 125' x 125' leased area of the property). The proposed tower structure complies with the required setbacks by providing a 1,041.5' front yard setback, 298' and 550' side yard setbacks and a 911' rear setback.

63.     The Facility will be unmanned and will be visited for routine maintenance approximately 1-3 times per year by Verizon Wireless.  Access to the Facility will be provided by an existing driveway and a new twelve (12) foot wide driveway (gravel and crushed stone base).

### B.  FAA Lighting/Conditions

64.     The Site is located within three (3) nautical miles of the HVRA, formerly known as the Dutchess County Airport.  As a result of its proximity to the airport, the Facility is subject to a review by the FAA.  The purpose of the FAA's review of the project is to determine whether the tower structure as proposed will result in a hazard to air navigation.

65.     As noted above, the FAA determined that the Facility will not be a hazard to air navigation as long as the tower structure is painted and lighted with FAA-approved lighting.

66.     To minimize potential impacts to neighboring properties, Blue Sky proposed to use a light manufactured by Flash Technologies for compliance with the FAA conditions.  The light is designed to limit light spill to the ground by creating a tight beam of light that is focused away from the ground and towards the horizon. The output of the light is described to be equivalent to a thirty (30) watt bulb viewed from the ground at 1,500 feet from the tower.  The lights are generally less intrusive than typical street lights.

67.     The low intensity nature of the light was demonstrated at the ZBA's November 4, 2019 meeting, when the proposed light was put on display.  It was apparent that the ceiling lights in the meeting room were more intense than the FAA required light.

68.     The Facility is an allowable land use subject to issuance of a Special Use Permit and Site Plan Review Approval by the Planning Board.  Because of the proximity to the airport, and the FAA requirement that the tower structure to lighted, the Facility also requires an area variance from the ZBA.

69.     Blue Sky and Verizon Wireless submitted an application for variance to Defendant ZBA on September 19, 2019 ("Variance Application").  The application sought a variance from the maximum height limitation contained in the Town Code, which limits the maximum height of any tower to that which can operate without artificial lighting.

70.     Because the identified gaps in wireless service are located in the RFD zoning district, Verizon Wireless and Blue Sky must locate the Facility in the area near the airport to adequately serve the identified coverage gaps and to remedy the existing capacity issues.

71.     Even though the Facility will be located in a residential zone, the nearest residential structure to the proposed Facility will be approximately 670 feet away.

72.     Because Verizon Wireless is a public utility for zoning purposes, its SUP Application and Variance Application for municipal approvals is not governed by the ordinary land use standards.  Instead, Verizon Wireless need only show that approval is "required to render safe and adequate service" and that there are "compelling reasons, economic or otherwise" for needing the variance.  *Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364, 372 (1993).  One such compelling reason is the elimination of service gaps in the wireless network.

### C.  *The Facility Serves a Public Need: Addressing a Significant Gap in Wireless Service*

73.     The FCC mandates (*see* 47 CFR §§ 22.940 and 24.16) that each wireless carrier must provide "substantial service" in its licensed service area or risk having its license revoked. The FCC defines "substantial service" as service that is sound, favorable, and substantially above a level of mediocre service.

74.     Under New York law, Verizon Wireless is a public utility.

75.     In order for Verizon Wireless to provide substantial, safe and effective service to its wireless users, it must have sufficient coverage and network capacity.  Coverage refers to the

14

geographic area serviced by a wireless communication facility. Capacity refers to the amount of network traffic a given site can process before significant performance degradation occurs, including inability to access the network (e.g. inability to make a call), dropped calls, or poor call or data throughput performance while connected to the network.

76.     To determine whether there is adequate wireless coverage, Verizon Wireless engineers use sophisticated computer modeling to produce RF propagation plot maps that analyze and predict signal power levels in a given area with respect to the selected minimum signal threshold. These RF propagation plot maps use various colors to depict the area surrounding a proposed Facility where the RF coverage levels meet or exceed the minimum RF signal levels. The absence of color on an RF propagation plot map, which is represented as white, indicates those areas where wireless facilities cannot provide the minimum signal levels. These white areas are called coverage "gaps" and are indicative of areas experiencing unreliable wireless service.

77.     The primary purposes of the Facility in the Town of LaGrange are to provide: (A) adequate Verizon Wireless advanced 4th Generation (4G) LTE service (in both the 700 MHz and 2100 MHz frequencies) to the southwestern portion of the Town and the northern portion of the Town of Wappinger; and (B) substantial capacity relief to the existing local network by providing a new dominant server at the Site.

78.     The Facility will extend coverage: (A) approximately 1.0 mile along Titusville Road, (B) 0.8 miles along Noxon Road; (C) 0.55 miles along Smith Crossing Road; (D) several miles of local and community roads; and (E) to homes and businesses across the southwestern portion of the Town ("**Gap Area**"). This Gap Area is illustrated in white on the propagation plot map attached to the Complaint as **Exhibit B**, p. 21.

79.     The proposed Facility is also critical to relieving existing network capacity issues that are created by increased use of wireless services and existing local topography.

80.     The need for the Project was detailed in various RF reports throughout the review process, including the report attached to the Complaint as **Exhibit B**.

81.     The limited coverage currently in that portion of the Town referenced above is provided by Verizon Wireless' existing telecommunications facilities referred to as: (A) "LaGrange" (located 2.75 miles from the Site); (B) "New Hackensack" (located 1.25 miles from the Site); and (C) the "Fishkill Plains" site (located 3.5 miles from the Site).  All other Verizon Wireless facilities are either too far away from, and/or blocked by, the surrounding terrain and vegetative clutter to provide reliable service in the Town.

82.     The existing Verizon Wireless sites referenced above are not capable of providing the necessary coverage or capacity to the Gap Area.

83.     Due to technological constraints and interference caused by varying terrain, structures and vegetation, there is limited flexibility concerning the siting of a new wireless facility in or near the Gap Area that will function properly and provide adequate service (i.e., increased coverage and improved capacity).

84.     Due to the distance of the Gap Area from surrounding Verizon Wireless cell sites and the difficult terrain features that serve as a barrier to adequate wireless service in that area, the construction of a new, locally-based communications facility is required to provide a continuous level of communications service to the Gap Area.

85.     The Facility must be located in fairly close proximity to the HVRA to provide reliable service and capacity relief to the Gap Area.

86.     The proposed Facility will not only provide 4G wireless service to the Gap Area, it will also provide much needed and significant capacity improvements and relief across the southwestern portion of the Town.

87.     Verizon Wireless demonstrated the need for additional network capacity in the areas along Titusville Road, Noxon Road, Diddell Road, Daley Road and Malory Road.  Three (3) of the existing Verizon Wireless sites closest to the Site have reached or are projected to reach their capacity limits in the very near future.  The Facility, at its proposed location, has been designed to provide much needed capacity relief to the Verizon Wireless sites serving neighboring areas of the Town.  Absent the proposed Facility, Verizon Wireless service in the Gap Area will continue to decline.

### D.     The Town's RF Engineering Consultant Found that the Facility at the Proposed Location is Necessary to Alleviate Existing Coverage Gaps

88.     The Town's RF consultant confirmed the existence of significant gaps in wireless service in the Gap Area.

89.     The Town's RF consultant found that the Facility at the Site will address the identified gaps in wireless service in the Town.

90.     Early in the review of the SUP Application, the Town retained Ronald E. Graiff, a New York licensed professional engineer and radiofrequency engineering consultant to review the SUP Application for the Facility on the Town's behalf.  Mr. Graiff is well-known in the telecommunications field and for many years has assisted municipalities in the technical review of telecommunication facility towers such as the one proposed.

91.     On April 16, 2018, Mr. Graiff reported to the LaGrange Planning Board that he had reviewed the Verizon Wireless updated RF Analysis and found as follows: "FINDING: Your Board may consider the application, from a radio frequency engineering report complete in content

17

and justifies the need for the site at the proposed location." *See*, Mr. Graiff's April 16, 2016 report, attached hereto as **Exhibit C**, at p. 2 (emphasis provided).

92.     Mr. Graiff's April 16, 2018 findings were included in the Variance Application as Exhibit 6 to such application.

93.     On September 2, 2019 and subsequent to the relocation of the Facility to the currently proposed Site, Mr. Graiff issued a supplemental report to the Town.  The purpose of his supplemental report was: (i) to comment on the updated RF analysis prepared by Verizon Wireless' RF Design Engineer (prepared to make the report current and to investigate the new location proposed by the Planning Board), and (ii) to examine Verizon Wireless' conclusion concerning a possible alternative location for the proposed Facility on property referred to as the Corbin Farm.

94.     Mr. Graiff's September 2, 2019 supplemental report acknowledged the original RF analysis prepared by Verizon Wireless' RF Design Engineer, George Karim, and reiterated his opinion that with respect to such report, "it was clear that there was a gap in coverage in the area identified and that the proposed site did do significant good to fill in that gap." *See* Mr. Graiff's September 2, 2019 report attached as **Exhibit D**, p. 1 (emphasis provided).   Mr. Graiff's supplemental report was included in Exhibit 6 of the Variance Application.   Mr. Graiff also concluded that Mr. Karim's original report "utilized minimum signal strengths that are appropriate for the area with the type of system being utilized, that being LTE." *Id.*

### E.  Site Selection Process/Evaluation of Alternate Sites

95.     Selecting a location for a new wireless facility is subject to several variables, including the existing network configuration, terrain features, network traffic distribution, and other factors.

96.     Proper spacing between wireless facilities is critical from a network performance and capacity perspective. Sites located too close to one another will result in unacceptable network interference which will actually degrade service. Sites located too far apart will not serve the ultimate purpose of covering network gaps and providing effective capacity relief to over-congested network traffic areas.

97.     Utilizing these principles, Verizon Wireless identified the geographic area, or search ring ("Search Ring"), in which a new wireless telecommunications facility could be located to most likely provide the required coverage and capacity needs for the Gap Area. The original Search Ring for the Facility was identified in the Search Ring Justification report dated December 7, 2016 prepared by Verizon Wireless' RF Design Engineer, George Karim, in the original SUP Application.

98.     To assist Verizon Wireless in identifying an appropriate parcel for the development of its Facility, Airosmith Development ("Airosmith") was retained to physically inspect and investigate properties within the Search Ring and the surrounding area. The product of Airosmith's efforts was detailed in a RE Site Selection report, dated December 7, 2016. The report was included in the original SUP Application submitted to the Planning Board. Figure 1 of the RE Site Selection report shows the property lines of the various properties in and around the Search Ring, and other features that have the potential to limit development of a new communications facility, including federal and state regulated wetlands and flood plain areas.

99.     Local communities generally prefer the installation of antennas and equipment on existing communication towers or other tall structures ("collocation"), rather than the construction of new towers. Verizon Wireless also prefers collocation. Collocation is generally less expensive and often involves a streamlined zoning application process. In the Search Ring, however, there

are no collocation opportunities to address the gap in wireless service and capacity issues. This is addressed in the Site Selection Analysis.

100.    When collocation on an existing tower or tall structure is not feasible, a new site that can accommodate a new communications structure is needed.

101.    Having confirmed that no existing towers or tall structures were available within or near the Search Ring, Verizon Wireless and Airosmith evaluated all properties in the Search Ring that were large enough to accommodate the proposed Facility. When Verizon Wireless confirmed that properties within the Search Ring were not available, it expanded its search to properties located in the immediate area of the Search Ring.

102.    Verizon Wireless initially considered ten (10) different properties in and surrounding the Search Ring that were deemed potentially suitable for the Facility. Unfortunately, none of the ten (10) parcels were available or viable alternatives. In some cases, the owners of the parcels were not interested in leasing space to Verizon Wireless. Other properties were subject to deed restrictions that prohibited development of the Facility or were located in flood plains or wetlands. The elevation of at least one property was too low to serve the intended purpose. All the properties considered are discussed in Section 4 of the Site Selection Analysis.

103.    The only property within or near the Search Ring available (i.e., with a willing property owner and proper elevation and size to accommodate the Facility) was the Property owned by Mr. Charles Ostuni, which is the Property upon which the Facility is proposed.

### F. Corbin Farm and Old Sewage Plant – Alternative Sites Not Suitable

104.    In response to comments and questions raised by the Town and the public during review of the SUP Application, Verizon Wireless and Blue Sky evaluated whether the Facility

could be relocated to different properties, including the old sewage plant located on Scenic Hill or on an adjacent property known as the "Corbin Farm."

105.    Verizon Wireless' RF Design Engineer, Michael Crosby, informed the Town that the location of the old sewage plant was simply too far away from the target service area to be of any use.  For this reason, the old sewage plant property was correctly discounted as a viable alternative since it could not possibly provide the needed service to the Gap Area.

106.    Mr. Crosby prepared a Supplemental RF Analysis that stated the Corbin Farm was not a viable alternative to the proposed location due to the location of Corbin Farm being closer to the HVRA and at a higher elevation than the Property. *See* **Exhibit E**.

### G. Town's Consultant Agrees With Verizon Wireless' RF and Site Selection Analyses

107.    The Town's RF consultant confirmed that the proposed Facility is necessary.

108.    In his September 2, 2019 report, Mr. Graiff, the Town's consultant, commented on the updated analysis prepared by Mr. Crosby.  (Mr. Crosby is the Verizon Wireless RF Design Engineer that took over the Site from Mr. Karim.)  Mr. Crosby's updated analysis examined the feasibility of relocating the Facility to property (known as the Corbin Farm) that the Town Planning Board thought may be viable as an alternative to the proposed location.   In his supplemental analysis, Mr. Crosby confirmed that the potential alternative Corbin Farm property—which is closer to the HVRA and higher in elevation than the proposed Site, would not be a viable alternative to the proposed Site due to the fact that the maximum overall height of a new tower at such location would be limited to fifty-six (56) feet (i.e., a maximum antenna centerline of forty-eight (48) feet).  (*See* July 25, 2019 Letter/Report prepared by Verizon Wireless' RF Engineer, Michael Crosby, attached hereto as **Exhibit E**, p. 2.)  Mr. Graiff confirmed that "an antenna of just 48 feet above ground would not appear to be effective...." *See* **Exhibit D**, p. 2.

109.    Mr. Graiff also commented that he had not been provided with an FAA study confirming that the maximum height of a new tower structure on the Corbin Farm would be limited to fifty-six (56) feet.

110.    Blue Sky and Verizon Wireless satisfied Mr. Graiff's comments by providing the Town with an FAA/FCC Aeronautical Evaluation and AM Screening Report ("FAA Evaluation") for the Corbin Farm prepared by Caldwell Compliance, dated September 18, 2019 and attached to the Complaint as **Exhibit F**.  The FAA Evaluation confirmed that the:

> Corbin [Farm] Property is not suitable, from an aeronautical standpoint, for the proposed tower.  Due to the Corbin [Farm] Property being located approximately 600' closer to the Hudson Valley Regional Airport runway 6/24 and the site elevation being approximately 56' higher than the primary candidate site the proposed tower would penetrate into the POU Horizontal Surface Area as well as the Climb/Decent area for runway 6/24, creating a potential hazard for arriving and departing aircraft.

*Id.*

111.    The FAA Evaluation confirms that the maximum "No Hazard Determination Height" for a structure on the Corbin Farm would be fifty-six (56) feet.  That is the maximum height that would be allowed by the FAA on that property.

112.    The FAA Evaluation states that the maximum height of a tower on the Corbin Farm property that could be installed without lighting or marking is twenty (20) feet.

113.    Consequently, Mr. Crosby concluded, and Mr. Graiff concurred, that a fifty-six (56) foot tower at the Corbin Farm would not be adequate to resolve the coverage gaps.

114.    The Corbin Farm property is, therefore, not a viable alternative to the project Site.

115.    In all, Verizon Wireless and Blue Sky evaluated a total of twelve (12) locations for the development of a new telecommunications facility to meet the service needs of the Gap Area.

The Town's RF consultant confirmed that the project Site is the only one of those twelve (12) locations that will adequately address the service issues in the Gap Area and surrounding environs.

### H.  The Visual Impact Analysis

116.    The potential visual impacts of the project have been extensively analyzed.  Blue Sky and Verizon Wireless have prepared a total of three (3) separate visual resource evaluations, all of which have involved the use of "balloon tests," a generally accepted methodology to analyze potential visual impacts of tower structures.

### (i) 2017 Visual Study – Rettew Analysis

117.    The first visual analysis was prepared by Rettew Engineering & Surveying, PC dated April 20, 2017 ("Rettew Analysis").  The report evaluated potential visual impacts of the original tower (i.e., 124 feet) at its original location on the Property.  The specific locations analyzed were confirmed with the Town Planning Board. The Rettew Analysis examined a tower taller in height than that currently proposed at the new location on the property pursuant to the request of the Planning Board.  This analysis was conducted in April during a period of time when the deciduous leaves were not present.  This condition is often called "leaf-off" condition and represents a "worst case" scenario when the tower is the most visible due to lack of natural screening.

118.    Consistent with the Town's Code, the field study area encompassed a five-mile radius from the project Site. Rettew conducted a "balloon test," which involved floating three (3) five-and-a-half-foot diameter, helium filled weather balloons—one at 124 feet above ground level, equivalent to the height of the proposed tower and two additional balloons at 104 feet and 144 feet – to provide reference points for height and location and to provide a known dimension to aid in

the production of photo simulations.  Notice of the balloon test was published in the local paper in advance.

119.    Prior to the balloon test, Rettew utilized computer aided modeling to determine where, in theory, one might see the tower structure upon its completion.

120.    The Town specifically identified the locations from which the photographs of the balloons should be taken.

121.    During the balloon test, those areas from which the tower may be theoretically visible, partially visible through vegetation, or concealed by vegetation were confirmed by driving the study area with the balloons in the air.  The results were mapped on a View Shed Map that was included with the completed visual analysis with different colors representing: visibility (green), not visible due to topography (red) and concealed due to vegetation or structures (yellow).

122.    Photographs were taken from various vantage points within the study area (as determined by the Town) to document the actual view toward the proposed tower as well as the general character of the view shed.

123.    The results of the Rettew balloon test were memorialized in the Rettew Analysis, which was provided to the Town for its review.

124.    The Rettew Analysis confirms that the majority of the originally proposed tower would be screened from view and would only be visible or partially visible from eight (8) of the twenty-two (22) locations analyzed.  The Rettew Analysis also confirmed that the proposed tower would not result in any significant visual impacts.

### *(ii)  September 2018 Visual Study – Tectonic Analysis*

125.    During its review of the SUP Application, the Town suggested that Verizon Wireless and Blue Sky consider relocating the tower (from the original proposed location) to a different portion of the Property within an existing stand of trees.

126.    By relocating the Facility to the new location on the Property, Verizon Wireless and Blue Sky were able to incorporate changes to the antenna design to minimize potential visual impacts to the greatest extent feasible. The changes include the reduction of: (i) the height of the Facility, from 124 feet to 100 feet; (ii) the number of antennas from twelve (12) to six (6); and (iii) the size of the antenna mounts from twelve (12) feet wide to six (6) feet wide (collectively, "Antenna Redesign").

127.    At the request of the Town Planning Board, a second visual analysis and balloon test for the relocated Facility was conducted by Tectonic Engineering & Surveying Consultants, P.C. ("Tectonic").  The balloon test for this second analysis was discussed in detail with the Planning Board and a date of September 11, 2018 was chosen for the balloon test.  Notice of this balloon test was published in the Poughkeepsie Journal newspaper. As with the Rettew Analysis, the Planning Board confirmed the locations to be reviewed during the second balloon test.

128.    Upon receipt of the visual analysis, the Planning Board complained that the test was completed at a time when the leaves were on the trees, commonly known as the "leaf on" condition, even though the Planning Board was well aware that this second visual analysis would be conducted in late September when the leaves were still on the trees.

### *(iii)  January, 2019 Study – Visual Resource Evaluation*

129.    The Planning Board ordered that a third analysis be conducted during leaf off condition. Blue Sky and Verizon Wireless agreed to prepare a third visual analysis.

130.    On or about October 22, 2018, representatives of Verizon Wireless and Blue Sky met with certain members of the Planning Board at the Property to discuss the specific locations within the existing stand of trees to which the Facility could be relocated.  Two locations were chosen and identified by orange stakes.  Of the two locations, one had a higher elevation.  Verizon Wireless subsequently confirmed that it could accommodate the Town's request to relocate the Facility at the location with the higher elevation.

131.    The *third* balloon test was conducted by Tectonic Engineering on January 7, 2019 and memorialized in a Visual Resource Evaluation ("VRE") dated February 7, 2019. A copy of the VRE is attached to the Complaint in **Exhibit G**.  As with the prior two (2) balloon tests, notice of the third balloon test was published in the Poughkeepsie Journal newspaper.

132.    For comparison purposes, the third VRE included photographs and simulations of the proposed facility at the original location and reviewed Facility at the new location.   The simulations for each of the two locations show antenna arrays of two separate carriers, which was done at the request of the Planning Board. The simulations provided in Exhibit B of the VRE for the project Site include two different versions: labeled "S-#a" and "S-#b". The simulations labeled "S-#a" are simulations that represent the actual height of the proposed Facility. Simulations labeled "S-#b" represent a tower structure that is ten (10) feet taller than the proposed Facility. Simulations "S-#b" were required by the Planning Board to be included in the VRE even though such scenario was not part of the Project.

133.    The simulations in the VRE confirm the reduced visibility of the Facility from surrounding areas associated with the Antenna Redesign.

134.    Tectonic concluded in the third VRE that the proposed visual impacts of the redesigned tower at the new location on the property would not result in any significant adverse visual impacts.

### I. No Impact on Property Values

135.    Blue Sky and Verizon Wireless supplemented its SUP Application with a 2015 market study report that was prepared by qualified and reputable appraisers for existing wireless telecommunication sites showing that the construction of a telecommunications tower at other locations had no negative effect on surrounding property values (the "Market Study").

136.    This Market Study confirmed that the Facility would not adversely impact property values in the Town.   This is especially true considering that the majority of the Facility (approximately ninety (90) percent) will be screened by vegetation or topography.

### VII. THE VARIANCE APPLICATION

137.    Shortly after the issuance of the FAA Determination, Blue Sky and Verizon Wireless were advised by the Town that an area variance from the maximum height provision in the Code was required.

### A. Application

138.    Blue Sky and Verizon Wireless filed the Variance Application with the ZBA on September 13, 2019.

139.    The Variance Application included (i) a completed Application to Zoning Board of Appeals form; (ii) Statement of Intent describing the project and its need; (iii) detailed site plans; (iv) copies of Verizon Wireless' relevant FCC licenses; (v) an overview of the applicable public utility variance standard; (vi) an overview of the relevant provisions of the Telecommunications Act of 1996; (vii) a RF analysis describing in detail the existing gaps in service and capacity issues;

and (viii) the written reports of the Town's RF consultant which found that the proposed tower is in fact needed to resolve the existing gaps in service.

140.    The ZBA conducted a public hearing on the Variance Application on October 7, 2019, during which members of the public were afforded an opportunity to present comments to the ZBA.  After numerous comments were received, the ZBA closed the public hearing but kept the written public comment period open until close of business on Friday, October 11, 2019.

141.    By letter dated October 24, 2019, attorneys for Plaintiffs submitted comprehensive responses to public comments, and submitted supporting materials responsive to comments received on the Variance Application.

### B.  The ZBA Denied the Variance

### (i)  November 4, 2019 ZBA Meeting/Vote

142.    On November 4, 2019, the ZBA denied the Variance Application by a vote of 4-1.

143.    Despite being advised to do so by its legal counsel, the ZBA failed to discuss the applicability of the public utility variance standard (*Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364 (1993)) relative to the Variance Application.

144.    The ZBA failed to offer any reasons or rationale in public for its denial of the Variance Application at the November 4, 2019 meeting.

### (ii)  November 25, 2019 Decision

145.    In a written Decision, dated November 25, 2019, the ZBA, for the first time, purported to set forth its reasons for denying the variance.  (A copy of the Decision is annexed to the Complaint as **Exhibit H**.)

28

146.    The ZBA Decision cites as the first reason for denying the Variance Application the alleged "lack of evidence" that the proposed tower would adequately address the existing gap in coverage.

147.    Significantly, this purported reason was never discussed by the ZBA at the November 4, 2019 ZBA meeting.

148.    The ZBA's finding is also belied by the substantial evidence in the record, including the detailed RF Analysis prepared by Verizon Wireless' RF Design Engineer.

149.    The Town's RF consultant also expressly agreed with the Verizon Wireless RF engineers.   The Town's independent RF consultant specifically found that:

> "Your Board may consider the application, from a radio frequency engineering report complete in contents and justifies the need for the site at the proposed location."

(emphasis added).

150.    The second and final reason for denying the Variance Application is the allegation that "the proposed location of a lighted tower will have a significant negative visual impact on the surrounding communities…".

151.    This purported finding of significant negative visual impacts by the ZBA is not supported by the evidence contained in the record and is inconsistent with established law.

152.    Plaintiffs are seeking an order annulling the ZBA's Decision.

## VIII.  STATUS OF APPLICATION FOR SPECIAL USE PERMIT

153.    On November 21, 2019, Verizon Wireless and Blue Sky informed the Planning Board and its counsel that Verizon Wireless and Blue Sky intend to commence an action challenging the ZBA's Decision to deny the Variance Application, but Verizon Wireless would

continue to cooperate with the Planning Board if it wished to continue with its review of the SUP Application.

154.    Verizon Wireless also informed the Planning Board and its counsel that the Planning Board would be named as a defendant in the case, and Verizon Wireless and Blue Sky would seek an order of the Court directing issuance of a Special Use Permit if the Planning Board had not granted the permit by the time Plaintiffs move for injunctive relief.

155.    After consultation with its counsel, the Planning Board decided to proceed with its review of the SUP Application, but as of the date of this Complaint the permit has not been issued.

156.    Unless the Planning Board issues a Special Use Permit by the time the claims in this case are decided, an order directing the issuance of the permit is required by law.

157.    Once the ZBA denied Verizon Wireless and Blue Sky's application for a variance, the application for a Special Use Permit was rendered academic.   The Facility cannot be constructed and operated without the lights required by the FAA.

158.    The TCA requires a municipal board to render a decision in a reasonable period of time.  Because Plaintiffs' application for a Facility to address the Gap Area has been pending for years, injunctive relief as against all municipal boards in the Town of LaGrange is now warranted

### IX.    IRREPARABLE INJURY, PUBLIC INTEREST, AND BALANCE OF HARDSHIPS

159.    As a result of the Defendants' actions, Blue Sky and Verizon Wireless have been, and will continue to be, damaged and irreparably harmed absent the relief requested.

160.    The harm caused by Defendants' unlawful actions includes, but is not limited to, an effective prohibition on the Company's ability to provide personal wireless service in the Gap Area of the Town, and impairment of Verizon Wireless' (a) ability to provide the public in the Town with adequate and reliable service; (b) ability to compete with other providers of

telecommunication services; (c) full use of its existing licenses and business investments; and (d) good will and business reputation.

161.    The harm that Blue Sky and Verizon Wireless have suffered and are suffering from the Defendants' actions is not reasonably susceptible to accurate calculation and cannot be fully and adequately addressed through an award of damages.

162.    Moreover, the public interest in promoting competition in the telecommunications arena and the prompt deployment of services—the express goals of the TCA—has been irreparably harmed and will continue to be irreparably harmed by Defendants' unlawful actions.  Verizon Wireless's present and future customers, the public at large and emergency service providers are significantly prejudiced by the Defendants' unlawful conduct.

163.    In addition, wireless telecommunications are an important component of public safety and emergency response systems and provide a vital alternative to traditional land lines during times of public crisis.  By preventing Blue Sky and Verizon Wireless from installing equipment needed to provide adequate service, the Defendants' unlawful actions are causing irreparable harm to the public interest in deprivation of reliable emergency communications.

164.    Blue Sky and Verizon Wireless' original SUP Application for approval of the Facility to remedy service in the Gap Area has been pending since December 8, 2016, a period of almost three (3) years.  This delay in approval is causing irreparable harm to Blue Sky, Verizon Wireless and the public interest.  This lengthy delay violates the TCA.

165.    In contrast to the immediate and irreparable injury being suffered by Blue Sky, Verizon Wireless, its customers, and the public interest, the Defendants will not suffer any significant injury if the Court issues the requested injunction.  Blue Sky and Verizon Wireless have

met all of the requirements for the land use approvals it seeks under controlling State and Federal law, including the applicable public utility variance standard.

## X.  ALLEGATIONS SUPPORTING DECLARATORY RELIEF

166.    At present, an actual controversy has arisen and now exists between the parties regarding their respective legal rights and duties.  Blue Sky and Verizon Wireless contend that the Defendants' actions are in violation of the TCA and New York State law, and that Blue Sky and Verizon Wireless are entitled to all of the approvals necessary to proceed with the Project.

167.    Blue Sky and Verizon Wireless—and the public—have been and will continue to be adversely affected by the Defendants' unlawful acts and any further delay in approval and construction of the project.

168.    Accordingly, declaratory relief is appropriate and necessary to adjudicate the extent of Blue Sky and Verizon Wireless' rights and Defendants' duties and authority.

## COUNT I

## THE TOWN HAS UNLAWFULLY PROHIBITED THE PROVISION OF PERSONAL WIRELESS SERVICES IN VIOLATION OF THE TCA, 47 U.S.C. §332(c)(7)(B)(i)(II)

169.    Blue Sky and Verizon Wireless repeat and incorporate by reference all preceding paragraphs.

170.    The TCA provides, in relevant part, that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof…shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. §332(c)(7)(B)(i)(II).

171.    The Facility is a "personal wireless service facilit[y]" providing "personal wireless services" within the meaning of the TCA.

172.    A prohibition on the provision of personal wireless services occurs within the meaning of the TCA when there is a significant gap in a wireless carrier's service[2] and the proposed Facility is the least intrusive means to fill that gap.

173.    The record shows that Verizon Wireless has a significant gap in service in the Town of LaGrange.

174.    The record further demonstrates that the proposed Facility, which would be substantially concealed by existing vegetation and use of an approved FAA light designed specifically to limit light spill to the ground, is the only means to fill that gap.

175.    While the Town's Code limits the maximum height of communications facilities to that which can operate without artificial lighting, the record demonstrates that the proposed Facility is required to be marked and lighted pursuant to existing FAA regulations.

176.    The record shows that Verizon Wireless is unable to comply with the Town's maximum height limitation <u>and</u> comply with FAA conditions <u>and</u> provide adequate service in the form of coverage and capacity to the Gap Area.

177.    Verizon Wireless and Blue Sky incorporated substantial design elements into the Facility design to substantially reduce its visual impacts to the greatest extent feasible.

178.    Blue Sky and Verizon Wireless' Variance Application fulfills all of the criteria and requirements for approval of the Project under the Town's Zoning Code and New York State law.

179.    The Defendants' unsupported and legally unsustainable denial of Plaintiffs' Variance Application has had, and will have, the continued effect of prohibiting Verizon Wireless

---

[2] Gaps in service are just one indicator of an effective prohibition of service in violation of federal law. *See* In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 FCCR 9088, 9104 (2018).

from providing wireless services pursuant to its FCC license in violation of 47 U.S.C. §332(c)(7)(B)(i)(II).

180.    Verizon Wireless and Blue Sky have suffered and will continue to suffer irreparable injury as a result of Defendants' violation of the TCA.

## COUNT II

**THE TOWN HAS UNLAWFULLY DENIED BLUE SKY AND VERIZON WIRELESS' VARIANCE APPLICATION WITHOUT SUBSTANTIAL EVIDENCE IN THE WRITTEN RECORD IN VIOLATION OF THE TCA, 47 U.S.C. §332(c)(7)(B)(iii).**

181.    Blue Sky and Verizon Wireless repeat and incorporate by reference all preceding paragraphs.

182.    Section 332(c)(7)(B)(iii) of the TCA provides that:

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

183.    The Facility is a "personal wireless service facility" as defined in the TCA.

184.    Defendant ZBA voted to deny Plaintiffs' Variance Application on November 4, 2019.

185.    Defendants have violated Section 332(c)(7)(B)(iii) of the TCA, because their denial of Plaintiffs' Variance Application is not based on substantial evidence.

186.    The decision is contrary to the record evidence, the expert opinions of the Town's own consultant, and the advice of the Town Attorney.

187.    Blue Sky and Verizon Wireless have suffered and will continue to suffer irreparable injury as a result of Defendants' violation of the TCA.

## COUNT III

## THE TOWN IS FEDERALLY PREEMPTED FROM DENYING BLUE SKY AND VERIZON WIRELESS' VARIANCE APPLICATION ON TECHNICAL GROUNDS

188.     Blue Sky and Verizon Wireless repeat and incorporate by reference all preceding paragraphs.

189.     The Supremacy Clause of the U.S. Constitution, found at article VI, clause 2, declares that "the Laws of the United States…shall be the supreme Law of the Land…any thing in the Constitution or Laws of any State to the contrary notwithstanding."

190.     Under the Supremacy Clause, State and local laws and actions that conflict with the dictates of federal law, either explicitly or implicitly, are preempted and must yield to federal law.

191.     One of the main aims of the TCA is "to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition."   See H.R.Rep. No. 104-458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 10, 124.

192.     The TCA is administered by the FCC, which was created:

> For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all people of the United States…a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communications…

47 U.S.C. §151.

193.    The FCC, as the federal agency charged with administering the TCA and regulating

the wireless telecommunications industry, issued a Declaratory Order on November 19, 2009 to

clarify and interpret the TCA ("FCC Order"). The FCC order states as follows:

> *Delays in the processing of personal wireless service facility siting applications are*
> *particularly problematic as consumers await the deployment of advanced wireless*
> *communications services, including broadband services,* in all geographic areas in
> a timely fashion. Wireless providers currently are in the process of deploying
> broadband networks which will enable them to compete with the services offered
> by wireline companies…in the 700 MHz band, the Commission adopted stringent
> build out requirements precisely to ensure the rapid and widespread deployment of
> services over this spectrum. State and local practices that unreasonably delay the
> siting of personal wireless service facilities threaten to undermine achievement of
> the goals that the [FCC] sought to advance in these proceedings. *Moreover, they*
> *impede the promotion of advanced services and competition that Congress deemed*
> *critical in the TCA…*

[emphasis added]

194.    The FCC order is designed to promote advanced services and competition.  This

includes the provision of Verizon Wireless's advanced 4th Generation (4G) LTE services in the

Gap Area of the Town.

195.    It is the stated "policy of the United States to encourage the provision of new

technologies and services to the public." 47 U.S.C. §157(a).

196.    Federal law further provides that "[n]o State or local statute or regulation, or other

state or local legal requirement, may prohibit or have the effect of prohibiting the ability of any

entity to provide *any* interstate or intrastate telecommunications service."  47 U.S.C. §253(a)

(emphasis added).

197.    Through the TCA, the federal government has expressly limited the authority of

state and local governments to regulate personal wireless service facilities, like the proposed

Facility. *See* 47 U.S.C. §§ 332(c)(7)(A) and (B).

198.    The Town's authority over zoning and land use matters, as circumscribed by Section 332(c)(7) of the TCA, does not extend to technical and operational matters, over which the FCC and the federal government have exclusive authority.

199.    Because of the FCC's pervasive regulation of broadcasting technology, the Town is preempted from exercising its zoning power based on matters directly regulated by the FCC or based on the Town's independent assessment regarding the wisdom or necessity of certain wireless communications technology or operational standards.

200.    The FAA was established with the enactment of the Federal Aviation Act of 1958 (72 Stat. 731). One of the primary purposes of the FAA is to administer programs related to aviation safety.

201.    The FAA has established guidelines relative to obstruction marking and lighting which are intended to protect navigable airspace.

202.    Put simply, the Town is preempted from regulating the technological and operational standards of wireless carriers and is therefore preempted from making zoning decisions based on its independent (and unfounded) determination concerning the wisdom or need for advanced wireless technologies authorized, approved and/or licensed by the FCC, such as Verizon Wireless's advanced 4G LTE services.

203.    Pursuant to the FCC's delegated powers and the federal policy of encouraging new and advanced technologies and services to the public, the FCC has issued a license to Plaintiff Verizon Wireless to provide advanced 4G LTE wireless telecommunications services in the Town.

204.    The Town is also pre-empted from regulating the field of navigable airspace and, consequently, the Town is prohibited from making determinations concerning the need for FAA marking and lighting.

205.    By its SUP Application and Variance Application and pursuant to its FCC license, Verizon Wireless sought to construct and operate the Facility to provide these advanced 4G LTE wireless telecommunications services to the identified Gap Area in the Town.

206.    In denying that Variance Application, however, the Town erroneously and contrary to statute, and FCC Orders determined that Verizon Wireless' wireless services were not needed for the provision of safe and adequate wireless service in the Gap Area and that the Facility would not enhance RF coverage and capacity.

207.    In denying the Variance Application, the ZBA also erroneously ignored the fact that the Site was not only the least intrusive means to remedy the coverage gaps and capacity issues, but was the only means to do so.

208.    The Town's denial interferes with Congress' goal of ensuring safe and adequate service for all members of the public and of facilitating the spread of new technologies and the growth of wireless service.

209.    The Town's denial also runs counter to the FCC mandates at 47 CFR §§ 22.940 and 24.16 that each wireless carrier provide "substantial service," in its licensed service area or risk having its license revoked.

210.    The Town cannot interfere with the federal government's regulation of the technical and operational aspects of wireless telecommunications technology by refusing to allow advanced wireless technologies into their communities by carriers, like Verizon Wireless, who have been federally licensed to provide those advanced services.

211.    Blue Sky and Verizon Wireless have suffered and will continue to suffer irreparable injury as a result of Defendants' preempted acts and is entitled to a declaration that the Town is federally preempted from denying the Variance Application.

## COUNT IV

### ARTICLE 78 OF THE NEW YORK CIVIL PRACTICE LAW AND RULES

212.    Blue Sky and Verizon Wireless repeat and incorporate by reference all preceding paragraphs.

213.    Article 78 of the New York Civil Practice Law and Rules ("CPLR") provides a device for challenging the official acts of State and local officials, including the Defendants herein.

214.    CPLR §7803 provides a right of action against a government body or officer where a question is raised as to (i) whether officials or a government body "failed to perform a duty enjoined upon it by law"; (ii) whether it has "proceeded, is proceeding or is about to proceed without or in excess of jurisdiction", (iii) whether "a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion.."; or (iv) whether "a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence."

215.    Defendants' determination to deny Blue Sky and Verizon Wireless' Variance Application was not supported by substantial evidence in the record, was arbitrary and capricious, was an abuse of discretion, and was affected by an error of law.

216.    Plaintiffs have suffered injury as a result of Defendants' actions, and timely commenced this action.

**WHEREFORE**, Plaintiffs Blue Sky and Verizon Wireless respectfully request that this Court issue an Order and Judgment:

a.    Declaring that Defendants' denial of the Variance Application prohibits, or has the effect of prohibiting, the provision of wireless service in violation of 47 U.S.C. §332(c)(7)(B)(i)(II);

b.    Declaring that Defendants' denial of the Variance Application constitutes a violation of 47 U.S.C. §332(c)(7)(B)(iii) in that it is not supported by substantial evidence contained in the written record;

c.    Declaring that the Defendants are federally preempted from regulating the technological and operational standards of wireless carriers and are therefore preempted from denying the Variance Application;

d.    Declaring that the Defendants are in violation of Federal and New York State law;

e.    Declaring that the Defendants' denial of the Variance Application was affected by an error of law, was arbitrary and capricious and an abuse of discretion, and was not supported by substantial evidence based on the entire record;

f.    Annulling the decision to deny the Variance Application;

g.    Ordering and directing the Defendants to immediately issue all local approvals and permits necessary to allow construction and operation of the proposed Communications Facility, including (without limitation) all building permits, site plan approvals, special use permits, and variances;

h.    Awarding Blue Sky and Verizon Wireless the costs, disbursements, and expenses of this action, including reasonable attorneys' fees; and

i.    Granting such other and further relief as this Court deems just and proper.

Dated:  December 2, 2019          YOUNG/SOMMER LLC

                        By:

                            Scott P. Olson Bar Number: SO0517

                            J. Michael Naughton Bar Number: JN9548
*Attorneys for Blue Sky Towers III, LLC and Orange County-Poughkeepsie Limited Partnership d/b/a Verizon Wireless*
5 Palisades Drive, Suite 300
Albany, New York 12205
Telephone: (518) 438-9907
Fax: (518) 438-9914
Email: solson@youngsommer.com
Email: mnaughton@youngsommer.com

41